IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 3:22CR0087MJN** |
| Plaintiff, | |
| vs. | **JUDGE NEWMAN** |
| **FREDERICK CLARK FRY,** | |
| Defendant. | |

**SENTENCING MEMORANDUM**

Mr. Fry asks this Court to impose a sentence of five years of incarceration in this case. Several factors suggest that a period of incarceration greater than five years is more than necessary to carry out all the goals and considerations of sentencing.

**A Sentence Sufficient, But Not Greater Than Necessary**

To begin, a sentence greater than five years for Mr. Fry is likely to be a death sentence. Mr. Fry was born in 1952 and is 70 years old. Life expectancy for a man born in 1952 is just 73.7 years, according to the Social Security Administration Actuarial Life Expectancy Table.[1] Current life expectancy of an American male is 76.4 years, but given Mr. Fry's poor health, coupled with his incarceration, it is unlikely that Mr. Fry will live to reach this milestone. It should not be surprising that incarceration reduces life span. What may be surprising is just how large the impact

---

[1] https://www.ssa.gov/oact/TR/2011/lr5a4.html

1

of incarceration is on mortality. "For every year actually spent in prison, overall life expectancy decreases two years."[2] This was the conclusion of a study published in 2013 in the American Journal of Public Health.[3] The study concluded that "[e]ach additional year in prison produced a 15.6% increase in the odds of death for parolees, which translated to a 2-year decline in life expectancy for each year served in prison." *Id.* Thus, if this Court sentences Mr. Fry to a term of five years, this five-year period of incarceration would typically decrease Mr. Fry's life expectancy by ten years.

Coupled with Mr. Fry's age is the fact that Mr. Fry has a serious heart condition that continues to pose a grave risk to his survival. Mr. Fry had a heart attack in 2016, and he had a stent implanted in his heart at that time. In 2021, He was further diagnosed with coronary heart/artery disease, and this heart condition continues to pose a serious risk to Mr. Fry's mortality.

Mr. Fry hopes that he will be released from custody one day, and he hopes to die in the company of his wife of 50 years. But realistically, Mr. Fry faces the chance he will die in prison, especially if he is sentenced to more than the mandatory minimum term. Even a five-year term of incarceration will be difficult for Mr. Fry to survive, at least statistically. Consider that if Mr. Fry survives five years in prison, he will be 75, approaching 76 years of age. As previously noted, the *current* life expectancy for a male in the United States is 76.4. Assuming that incarceration does reduce life expectancy, as published research and common sense suggest, any reduction in life expectancy based on incarceration would place Mr. Fry's age above his life expectation. If every year of incarceration on average does reduce life expectancy by two years, as the study above

---

[2] https://news.vanderbilt.edu/2013/02/05/prison-sentence-take-release/
https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301148?role=tab&journalCode=ajph
[3] https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301148?role=tab&journalCode=ajph

2

suggests, Mr. Fry's life expectancy drops several years below his *current* age.

Several other additional factors also suggest that a sentence above a five-year term is greater than necessary.

**At 70 Years Old, Mr. Fry Has a Complete Lack of Criminal History**

Mr. Fry has zero criminal history and zero contacts with law enforcement – it does not appear that Mr. Fry has even ever had a traffic infraction. (Presentence Report, paragraph 59). Mr. Fry has had consistent employment throughout his life, and he has also volunteered his time in the community his entire life. Mr. Fry has lived a long and productive life in the Dayton community. Yes, Mr. Fry suffers from a deviant interest in viewing nude images of children. And, as reprehensible as this interest is, this interest is treated and studied as a mental disorder.[4] "The Diagnostic and Statistical Manual of Mental Disorders, 5th edition (DSM-5) categorizes pedophilia as a paraphilic disorder, which involves a nontypical sexual interest that causes distress or harm to you or others."[5] And while Mr. Fry has not been diagnosed with pedophilia, he admits that his interest in viewing nude images of children is a "nontypical sexual interest that causes distress or harm to [him] or others," and he requests treatment for this disorder.

Mr. Fry does not minimize the criminality of his conduct – he accepted responsibility by pleading guilty to an offense that carries a minimum mandatory sentence of five years. By pleading guilty to this charge and sparing the government, the Court and the community the cost and expense of conducting a trial, Mr. Fry has clearly recognized the seriousness of his crime. As already discussed at length, Given Mr. Fry's age and cardio health, agreeing to a minimum of a five-year prison term is a remarkable act of acceptance. Many individuals in Mr. Fry's position

---

[4] https://jaapl.org/content/42/4/404#:~:text=DSM%2D5%20states%20that%20the,1%2C%20p%20698)
[5] https://psychcentral.com/disorders/causes-of-pedophilia#defining-pedophilia

would demand a trial, feeling they had little to lose. Mr. Fry accepts responsibility, and he asks this Court to recognize that a sentence of five years for a 70-year-old, first time offender is a sentence sufficient, but not greater than necessary.

Furthermore, a discussion of the child pornography guidelines and the nature of the offense in relation to the internet revolution is warranted.

**Online Access to Child Pornography**

As this Court is aware, the internet has vastly increased the availability and accessibility of child pornography, greatly expanding the number and category of people arrested for possession and distribution offenses involving child pornography. According to one scholar, the ease of the technology has meant that "[i]ndividuals who might not have become [child pornography] traffickers may do so after encountering the material in [peer-to-peer] networks." Janis Wolak, et al., *Measuring a Year of Child Pornography Trafficking by U.S. Computers on a Peer-to-Peer Network*, 38 Child Abuse & Neglect 347, 348-49 (2014). The accessibility of online child pornography may also "disinhibit and desensitize people, especially to the sexualization of children. Such easy access can spark curiosity and lead to sexual exploration that might otherwise have remained dormant or unstimulated." Eric Griffin-Shelley, *Sex and Love Addicts, Who Sexually Offend: Two Cases of Online Use of Child Pornography*, 21 Sexual Addiction & Compulsivity:The J. of Treatment & Prevention 322, 323 (2014); *see also* Hannah Lena Merdian *et al.*, *The Three Dimensions of Online Child Pornography Offending*, 19 J. of Sexual Aggression 121, 124 (2013) ("perceived anonymity and de-individuation of the internet may trigger behaviours which reflect inner personal desires that are usually suppressed by social constraints") (citation omitted).

4

**Child Pornography Offenders are Not the Same as Child Molesters**

This increase in child pornography accessibility, however, does not mean that individuals who view this material from their homes are committing hands-on sexual assaults against children. Several reports have found that, generally, child pornography offenders are "at low risk to commit hands-on sexual assaults of children." Austin F. Lee, *et al.*, *Predicting Hands-On Child Sexual Offenses Among Possessors of Internet Child Pornography*, 18 Psych., Pol. & Law 644, 668 (2012); *see also* Merdian, *et al.*, *supra*, at 123 (summarizing studies and concluding that "[f]or most offenders, their online offending has no behavioral link to contact sex offending"); Carissa Byrne Hessick, *Disentangling Child Pornography from Child Sex Abuse*, 88 Wash. U. L. Rev. 853, 875 (2011)(noting that "the empirical literature is unable to validate the assumption that there is a causal connection between possession of child pornography and child sex abuse."). Unfortunately, "modern practices have resulted in some *defendants who possess child pornography receiving longer sentences than defendants who sexually abuse children*." *Id.,* (footnote omitted; emphasis added).

Research also suggests that the recidivism rate of child pornography offenders is low, with most child pornography viewers unlikely to engage in future sexual offenses. *See Sentencing Comm'n, Federal Child Pornography Offenses, at 310* (the Commission's recidivism study of 610 non-production offenders showed that the offenders' "general recidivism rate . . . was 30.0 percent during an average follow-up period of eight and one-half years after the offenders' reentry into the community" while the offenders' "known sexual recidivism rate, a subset of the general recidivism rate, was 3.6 percent.").

**Importance of Parsimony Clause Heightened Because of Flawed Guideline**

Pursuant to the "parsimony clause" in section 3553(a), a court is to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" at section 3553(a)(2). 18 U.S.C. § 3553(a). This authority is at its greatest when the offense Guideline at issue is not the product of the Commission's empirical analysis and technical expertise. This is the case with respect to the Guidelines for child pornography offenses, which were amended at the direction of Congress rather than through the Sentencing Commission's empirical approach. The Commission opposed some changes to the Guidelines directed by Congress and has sought authority from Congress to amend the current child pornography provisions. U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 322 ("[T]he Commission believes that Congress should enact legislation providing the Commission with express authority to amend the current guideline provisions that were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines.").

**Child Pornography Guidelines are Uniformly Condemned**

The United States Sentencing Commission has voiced concerns with respect to the current Guidelines' ability to reflect varying degrees of culpability given the impact of recent technological changes on the offense of child pornography. The Commission opposed increasingly harsher penalties imposed by the legislature. *See* United States Sentencing Commission, *The History of the Child Pornography Guidelines*, Oct. 2009.[6] In 2012, the Commission completed a multi-year examination of "offenders sentenced under the federal sentencing guidelines and corresponding penal statutes concerning child pornography offenses." U.S. Sentencing Comm'n,

---

[6] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchprojects-and-surveys/sexoffenses/20091030_History_Child_Pornography_Guidelines.pdf.

*Federal Child Pornography Offenses*, at i.[7] The Commission was especially concerned with the Guidelines applicable to non-production child pornography offenses and the extent to which they managed to meaningfully distinguish among different offenders' levels of culpability. As explained in the resulting report, "several factors" prompted the Commission's examination:

> First, during the past two decades, cases in which offenders have been sentenced under the child pornography guidelines, while only a small percentage of the overall federal criminal caseload, have grown substantially both in total numbers and as a percentage of the total caseload.
>
> Second, since the enactment of the PROTECT ACT of 2003 and *United States v. Booker*, which made the guidelines "effectively advisory" in 2005, there has been a steadily decreasing rate of sentences imposed within the applicable guidelines ranges in nonproduction cases.... *These sentencing data indicate that a growing number of courts believe that the current sentencing scheme in nonproduction offenses is overly severe for some offenders....*
>
> Third, *as a result of recent changes in the computer and Internet technologies that non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degree of culpability*. Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging a decade ago and now facilitate large collections of child pornography. The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the internet. As a result, four of the six sentencing enhancements in § 2G2.2—those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels—now apply to most offenders and, thus, *fail to differentiate among offenders in terms of their culpability*. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders. Indeed, most of the enhancements in § 2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained

---

[7] https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses

>child pornography in printed form in the mail.
>
>Fourth, recent social science research—by both the Commission and outside researchers—has provided new insights about child pornography offenders and offense characteristics that are relevant to sentencing policy. This research includes information regarding the prevalence of child pornography offenders' criminal sexually dangerous behavior both before their arrests and after their ultimate reentry into the community following their convictions, as well as *emerging research on the efficacy of psycho-sexual treatment of offenders' clinical sexual disorders*.
>
>Finally, most stakeholders in the federal criminal justice system consider the nonproduction child pornography sentencing scheme to be seriously outmoded. Those stakeholders, including sentencing courts, increasingly feel that they "are left without a meaningful baseline from which they can apply sentencing principles" in nonproduction cases.

*Id*. at i–ii (emphasis added).

While observing that "[a]ll child pornography offenses are extremely serious because they both perpetuate harm to victims and normalize and validate the sexual exploitation of children," the Commission concluded that "revisions are needed to more fully differentiate among offenders based on their culpability and sexual dangerousness." *Id*. at 311. The Commission recommended that "the non-production child pornography sentencing scheme should be revised to account for recent technological changes in offense conduct and emerging social science research about offenders' behaviors and histories, and also to better promote the purposes of punishment by account for the variations in offenders' culpability and sexual dangerousness." *Id*. at xvii. It also recommended that Congress "amend the statutory scheme to align the penalties for receipt and possession offenses." The distinction between the conduct, according to the Commission's review of over 2,000 non-production cases, was "indistinguishable." *Id*. at xix, xx.

**Department of Justice Acknowledges Guideline Flaws**

As the Commission noted above, several of the enhancements applicable to defendants convicted of non-production offenses will almost always be applicable. The United States Department of Justice has expressed concern with the current Guidelines' failure to afford proper punishment for child pornography offenses and has requested the Sentencing Commission to revise the Guidelines, writing: "the evolution of the child pornography 'market' ha[s] led to a significantly changed landscape—one that is no longer adequately represented by the existing sentencing guidelines." Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation & Interdiction, Office of the Deputy Attorney General, U.S. Dep't of Justice, to Honorable Patti B. Saris, Chair, United States Sentencing Comm'n, (Mar. 5, 2013). The Department of Justice acknowledged that certain Guideline provisions, including the 2-level computer enhancement, do not adequately distinguish between different categories of defendants. "Because the vast majority of child pornography offenses now involve the use of a computer, this [specific offense characteristic] should be eliminated and replaced by others...." *Id.*

**Many Offenders Comparable to Mr. Fry Receive Sentences Below Five Years.**

18 U.S.C. § 3553(a)(6) requires an analysis of comparable sentences. Disagreement with the current sentencing scheme has convinced an increasing number of judges to impose sentences below those recommended by the Guidelines in nonproduction cases. *See, e.g.*, U*nited States v. D.M.*, 942 F. Supp. 2d 327, 347-48 (E.D.N.Y. 2013) ("The unreasonable harshness of the Guidelines for an offense of child pornography possession, of which defendant is charged, has been recognized by courts and judges from across the country."). This has led to a judge-initiated trend of departing downward for defendants in child pornography offenses that has emerged in

9

recent years. *See* Jeffrey T. Ulmer, *Mismatch of Guidelines and Offender Danger and Blameworthiness Departures as Policy Signals from the Courts*, 13 Criminology & Pub. Pol'y 271, 275 (2014).

In departing downward, district judges nationwide have spoken out against the harsh suggested guideline ranges for child pornography offenders. *See, e.g.*, *United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) ("Under the Guidelines, some of the recommended sentences for viewers can, with enhancements, be higher than those for actual predators... In effect, the Guidelines presume that those who view child pornography are indistinguishable from those who actually abuse children."). With respect to defendants convicted of possession offenses, some courts have imposed sentences with minimal or no incarceration. *See, e.g.*, *United States v. Stall*, 581 F.3d 276, 277-78 (6th Cir. 2009) (affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of supervised release); *United States v. Prisel*, 316 F. App'x 377, 378 (6th Cir. 2008) (affirming non-Guidelines sentence of one day in prison followed by eighteen months of home confinement for possession of child pornography); *see also United States v. Morace*, 594 F.3d 340, 351 n.10 (4th Cir. 2010) (noting "that some district courts have begun sentencing defendants convicted of possessing child pornography to one day of incarceration followed by a term of supervised release").

**Supervision and Registration Requirements Are Significant**

In addition to the conditions of his life-long supervised release, Mr. Fry will be subject to rigid sex offender registration requirements under federal and state law. *See* 42 U.S.C. § 16913; 18 U.S.C. § 3583(k). Such post-release conditions represent exacting collateral consequences, which serve to deter future criminal conduct. *Lawrence v. Texas*, 539 U.S. 558, 575 (2003)

(recognizing that the "stigma" imposed for violation of sex crime statute "is not trivial"). Sex offenders as a class have been subjected to some of the most severe collateral consequences of conviction, such as significant residency restrictions or registration requirements.

It is no exaggeration to say that once a person is convicted of an offense involving child pornography, the individual faces a lifetime of punishment. Defendants are considered pariahs with restrictions of residence, activities, and associations, and can become the targets of vigilante justice. These collateral consequences, among other factors, make unduly long periods of incarceration unnecessary.

**Conclusion**

Mr. Fry possessed 31 images and two videos containing child pornography. Mr. Fry admitted to searching "Tumblr" for pictures of nude minors and indicated that most of the images he located were images of "nudist colony families." Mr. Fry admitted to distributing two separate images of one minor, and he admitted to possessing two images that are considered sadistic because they involve penetration. The number and type of images Mr. Fry possessed, however, are considerably less egregious than the typical federal case involving child pornography, where defendants often possess and share thousands of images. This point is emphasized not to minimize Mr. Fry's offense, but to ask the Court to consider comparable defendant's conduct in fashioning a sentence sufficient, but not greater than necessary to carry out the goals of sentencing.

For all the reasons articulated above, Mr. Fry asks this Court to impose a five-year sentence.

                                         Respectfully submitted,

                                         DEBORAH H. WILLIAMS
                                         FEDERAL PUBLIC DEFENDER

                                         s/F. Arthur Mullins
                                         F. Arthur Mullins (0080483)
                                         Assistant Federal Public Defender
                                         One Dayton Centre, Suite 490
                                         1 South Main Street
                                         Dayton, Ohio 45402
                                         (937) 225-7687
                                         Art_Mullins@fd.org

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing was sent to all parties by way of the Clerk of Court's electronic filing system.

                                         s/F. Arthur Mullins
                                         F. Arthur Mullins